HENRY W. PARKER's ADMINISTRATRIX, appellant,

*v.*

SARAH G. PARKER's ADMINISTRATOR, respondent.

The facts in this case were held to support the vice-chancellor's opinion, that the appellant, who was the confidential adviser of his mother, and on whom, therefore, the burden of proof rested, had not proved satisfactorily the gift of a large sum of money by his mother to himself; and that, irrespective of his own testimony, whose admissibility was consequently not considered.

Parker *v.* Parker.

On appeal from a decree advised by Vice-Chancellor Bird, who filed the following conclusions:

In March, 1884, Mrs. Sarah G. Parker died, leaving two sons, James and Henry, and leaving a large estate valued at over $80,000, nearly all of which was in stocks, bonds, mortgages and other securities. She made her home with James, but confided nearly all of her estate to the care and custody of Henry, trusting him to make investments for her. In no other respect did she manifest any preference. The proof shows that she was quite careful to avoid any act which would benefit the one son more than the other. If she made purchases for one she would for the other, or give an equivalent. She purchased a barrel of sugar for James and gave Henry cash equal to the cost of the sugar.

Soon after the death of the mother, Henry and James met to make division between themselves of her estate. They divided, but not all. Since then a dispute has arisen between them as to the amount of the estate in Henry's hands. Henry held ten American Dock and Improvement Company bonds, valued at $1,000 each. James insists that they all belonged to his mother. Henry claims five of them as his own, and says he paid for them with his own money. James insists that Henry was indebted to his mother at the time of her death in the sum of $14,300 in addition to the sum of $9,800. Henry denies the former charge, but admits owing $9,800. In June, 1883, about nine months before her death, the mother gave to Henry her own check for $7,000. This James says he should account for. Henry claims it as a gift.

First, as to the bonds. Henry says, in his answer, that in the months of March and April, 1883, at the request of his mother, he had the cashier of the Freehold National Banking Company purchase five (5) $1,000 bonds of the American Dock and Improvement Company for his mother, which the cashier did, and says he delivered the bonds to his mother. In this he is sustained by other testimony than his own. His statement is corroborated by her bank account. Henry swears that the other

five shares were his own, and that he purchased them with his own money. On this point I think his testimony is admissible. His bank-book shows that in April, 1882, he was charged $4,856.25 for bonds. He collected the dividends on these five bonds, and was credited therewith in his account at bank. The testimony, so far as considered, decidedly sustains Henry, but very strong doubt is thrown over this branch of the case by what Henry himself did after the death of his mother, when the brothers met and made partial distribution. James asked Henry to make a statement of the assets in his hands, which Henry did. In that statement he includes "American Dock bonds, $6,000," the bonds being valued at $1,000 each ; this gives to the estate six bonds instead of five. That this was not an oversight in Henry is apparent from the fact that he appends to his former statement the items which had been distributed between them, and charges James with "American Dock bonds, $3,000," and adds "not divided yet, and due the estate of S. G. Parker," six items, one of $6,000, one of $250, one of $9,800, one of $170.50, and one in these words and figures, "Dock stock, 10 shares, par value, $1,000." In addition, James swears that Henry produced ten bonds, when they met for distribution, and said they belonged to his mother, and passed over to him (James) five of them, and said they were good. He says, after they had talked awhile, Henry remarked : " I guess you had better hand a couple of these bonds back to me, as I haven't looked on the bank-book lately." He handed back to Henry two of them, and afterwards inquired of him about it, when Henry said his mother had only six bonds. Henry denies making any such statement to James. I cannot but remark, that if James's statement is false in the main, it is a singular concoction. Henry admits, however, that he produced ten bonds with the securities which belonged to his mother, and that they were all placed upon the table, and that five of them were passed to James.

Now, notwithstanding Henry's emphatic statements under oath, and the entries in his bank-book, I am impressed with the belief that there must have been some transactions between himself and his mother, by which these bonds became hers before her

death. In the first place, it appears from his own showing, that these five bonds, which he claims as his own, were kept with his mother's bonds and her other securities, and that, when he pro- duced such securities to make distribution thereof between him- self and his brother, he also produced these five bonds which he now claims.

In the next place, there must have been serious doubt in his mind about it, or he would not have charged James, in his state- ment of the assets distributed, with the three bonds, without charging himself with the other two, which he did not do, although he retained them in his possession and charged himself with all the other items which he took in the division. His statement shows this fact. These undisputed facts are proof of the assertion that his mind was in doubt, and sustain the testi- mony of James when he says, that Henry expressed doubts and asked to have two bonds returned, and said he had not looked over the bank-book in some time.

And, in the third place, is the entry in Henry's statement, which he furnished to James after first making a general state- ment of the whole estate, in which only six bonds were men- tioned, and then a further statement following, in which he charges James with what had been passed over to him, and charges himself with what he had retained in the division, he makes this additional statement: "Dock stock, 10 shares, par value, $1,000," beside which on the margin is written these words, "Not divided yet, and due the estate of S. G. Parker."

If Henry was the *bona fide* owner of five of these bonds, I find myself wholly unable to reconcile such ownership with the three considerations just presented. It should be further con- sidered that the bonds which Henry says he purchased as his own, were purchased April 6th, 1882, and that only about two years expired before he and his brother met to make the division, and that he had made the purchase of the five bonds, which he admits belonged to his mother, only about a year before they met to make such division.

With these transactions so distinct, and occurring so recently, I cannot understand how there could have been any doubt in

Henry's mind, nor why he should make the statement that he-
did, if five of these bonds were his own.

I had endeavored to reconcile these circumstances with the tes--
timony given by Henry, and to conclude that these bonds belong
to him, as he swears they do, but I cannot.

Henry appeared, upon the witness-stand, as a fair and honest
witness. I was favorably impressed with his manner. Nothing-
was presented to awaken discredit. It is only fair I should say-
as much of James. Under such circumstances, what is the duty
of the court? Fortunately, long experience has established safe
rules. First, it is well established that courts must be governed
by the preponderance of testimony. Therefore, although the
brothers may be said to be equally interested, yet all the other
facts and circumstances above alluded to, seem to give the greater-
weight on the side of the complainant.

And, in the second place, it must be considered, because it has:
also been long and well established, that Henry was trustee or
agent for his mother, and had the care and custody of her estate,
and, as such, is held to a strict account; as such the burden is
upon him; it was for him to make clear and plain; to remove-
every reasonable doubt as to the ownership of these securities.

Consider next the claim of James that Henry owes the estate
$14,300, besides the note of $9,800. James says, that, some-
time prior to his mother's death, he called on Henry and had an
interview with him respecting his mother's securities, and spoke-
of the impropriety of Henry's holding the notes which he had
given to his mother, and that upon that occasion Henry produced
three notes drawn by himself, one for $5,800, one for $2,500 and
one for $6,000. He says that Henry retained these notes. It
will be observed that these sums aggregate $14,300, the amount
which James claims is now due, in addition to the $9,800. As
I understand James's testimony, he got the impression at the
time of the interview with Henry, before their mother's death,
that Henry said he owed $14,300, and from that fact and other-
circumstances, seems to have the conviction that that indebted-
ness remains, as well as the $9,800. Henry admits that at the-
time of that interview he did owe his mother $14,300, but says-

that afterwards he had a settlement with his' mother which included the three notes, and that he gave her a note for the amount found to be due her at that time, which was $9,800. This note bears date July 1st, 1882. The mother was present at that interview, and, so far as appears, did not question anything that Henry may have said.

Independently of Henry's testimony, I am not able to conclude that he should be charged, according to the prayer of the bill, with $14,300 and $9,800. It is true he produced notes aggregating the former amount when he and James met, and, while he does not now produce the same identical notes, he admits a liability of $15,800. I am aware of the force of the insistment that Henry was holding the securities of his mother, among which were these notes which he had given her, which created obligations on his part toward his mother of a fiduciary nature, yet I can see no reason for charging Henry with the destruction of the two notes (one for $5,800 and one for $2,500), since a larger amount of indebtedness remains and may fairly be supposed to be included in the $9,800 note. I am entirely satisfied that on this point there is nothing more due the estate than the $9,800 and the $6,000.

Consider, in the last place, the alleged gift of $7,000 to Henry: a check is produced in which the blanks are filled in by Henry, dated June 25th, 1883, signed by his mother, for $7,000. The last charge in her bank-book shows that this went into her account. Can this be sustained as a gift? The mother was then seventy-six years of age, declining, somewhat at least, in physical and mental strength. She died the next March. The physician produced said that he was called to visit her prior to and subsequent to the date of the check. He swears that her brain was paralyzed to a certain extent. He says that he saw symptoms of this several months before her death. I am satisfied, however, that Mrs. Parker was a woman of great vigor of intellect, retaining her faculties of thought and action to a great degree, excepting only so far as indicated by the physician. Nevertheless, I must consider the fact that she was an aged woman and the mother of Henry, in whom she had unbounded confi-

Parker *v.* Parker.

dence. This confidence is particularly striking in that she not only trusted him with her securities, evidences of indebtedness by others, but also with the securities which Henry himself had, given, showing his indebtedness to her in the amount of $15,800: I have no doubt, from the testimony and from what I have seen of Henry upon the witness-stand, that, to his mother, he was a prepossessing son, and that his influence over her was very great indeed, and that, too, without any special effort upon his part.

These things being so, such confidential relations existing, the burden of proof is on Henry, who claims the benefit of the gift; he has the money, it is true, and shows the formal way by which it passed to his credit. There he rests his case. Does this bring him within the rule of law and save him from accounting for the $7,000?

I think Henry is obliged to account for the $7,000. This view seems to be sustained by all the authorities. *Huguenin* v. *Baseley, 14 Ves. 273, 2 Lead. Cas. Eq. 556 (1156) &c.; Kerr Fraud & Mis. 182, 183, 189 (Am. notes).*

I will advise a decree in accordance with these views.

*Mr. Charles Haight* and *Mr. S. C. Cowart,* for the appellant.

*Mr. William H. Vredenburgh,* for the respondent.

PER CURIAM.

The decree of the court of chancery will be affirmed. This conclusion has been reached notwithstanding the testimony of the defendant below, and it will therefore not be necessary here to pass upon the admissibility of his testimony under the supplement to the act concerning evidence, approved February 25th, 1880. *Rev. Sup. 287 § 1. (a).* The question here arising under

(a) That in all civil actions in any court of law or equity of this state, any party thereto may be sworn and examined as a witness, notwithstanding any party thereto may sue or be sued in a representative capacity; *provided, nevertheless,* that this supplement shall not extend so as to permit testimony to be given as to any transaction with or statement by any testator or intestate represented in said action.

that statute is presented in another case now before this court, and will soon be decided.

*Decree affirmed.*

*For affirmance*—The Chancellor, Chief-Justice, Depue, Dixon, Garrison, Knapp, Reed, Scudder, Van Syckel, Brown, Clement, McGregor, Whitaker—13.

*For reversal*—Paterson—1.